**FILED**

**MAR – 8 2010**

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
Department of Justice, Antitrust Division
450 5th Street, N.W., Suite 8700
Washington, D.C. 20530,

STATE OF ARIZONA
Office of the Attorney General
1275 West Washington
Phoenix, Arizona 85007,

STATE OF COLORADO
Office of the Attorney General
1525 Sherman St., Seventh Floor
Denver, Colorado 80203,

STATE OF FLORIDA
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399,

STATE OF MAINE
Office of the Attorney General
6 State House Station
Augusta, Maine 04333,

STATE OF MARYLAND
Office of the Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202,

COMMONWEALTH OF MASSACHUSETTS
Office of the Attorney General Martha Coakley
One Ashburton Place
Boston, Massachusetts 02108,

STATE OF NEW MEXICO
Office of the Attorney General of New Mexico
111 Lomas Blvd. NW, Suite 300
Albuquerque, New Mexico 87102,

Case: 1:10-cv-00380
Assigned To : Bates, John D.
Assign. Date : 3/8/2010
Description: Antitrust

DECK TYPE:  Antitrust

DATE STAMP:

STATE OF TENNESSEE
Office of the Attorney General and Reporter
425 Fifth Avenue North,
Nashville, Tennessee 37243,

and

STATE OF WASHINGTON
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104,

*Plaintiffs,*

v.

ELECTION SYSTEMS AND SOFTWARE, INC.,
11208 John Galt Boulevard
Omaha, Nebraska 68137,

*Defendant.*

## COMPLAINT

Plaintiffs, the United States of America ("United States"), acting under the direction of

the Attorney General of the United States, and the States of Arizona, Colorado, Florida, Maine,

Maryland, New Mexico, Tennessee, and Washington, and the Commonwealth of Massachusetts

(the "Plaintiff States"), acting under the direction of their respective Attorneys General, bring this

civil antitrust action against defendant Election Systems and Software, Inc. ("ES&S"), to obtain a

permanent injunction and other relief to remedy the harm to competition caused by ES&S's

acquisition of Premier Election Solutions, Inc. and PES Holdings, Inc. (collectively, "Premier").

Plaintiffs allege as follows:

## I. **NATURE OF THE ACTION**

1.     ES&S is the largest provider of voting equipment systems in the United States.

On September 2, 2009, ES&S acquired Premier, a subsidiary of Diebold, Inc. ("Diebold"), then

the second largest provider of voting equipment systems in the United States.  As a result of that

acquisition, ES&S provides more than 70 percent of the voting equipment systems that registered

voters rely on to vote in federal, state and local elections held in the United States.

2.     Competition in the provision of voting equipment systems is critical to ensure that

vendors continue to develop accurate, reliable and secure systems, and provide those systems to

state, county and local election administrators at competitive prices.

3.     ES&S's acquisition of Premier combined the two largest providers of voting

equipment systems in the United States and the two firms that had been, for many customers, the

closest bidders for the provision of voting equipment systems.  As a result of this transaction,

prices for voting equipment systems likely will increase, while quality and innovation likely will

decline, as a consequence of reduced competition in violation of Section 7 of the Clayton Act, 15

U.S.C. § 18.

## II. **THE DEFENDANT**

4.     Defendant Election Systems and Software, Inc. ("ES&S") is a Nebraska

corporation with its headquarters in Omaha, Nebraska, and includes its successors and assigns,

its subsidiaries, including Premier, and its divisions, groups, affiliates, partnerships and joint

ventures, and their directors, officers, managers, agents, and employees.  Prior to its acquisition

of Premier, ES&S was already the largest provider of voting equipment systems in the United

States, had systems installed in at least 41 states, and collected revenue of $149.4 million in

2008.  Premier, now an ES&S subsidiary, was the second largest provider of voting equipment

systems in the United States prior to its acquisition, had equipment installed in 33 states, and

collected revenue of approximately $88.3 million in 2008.

### III.  JURISDICTION AND VENUE

5.      The United States brings this action against defendant ES&S under Section 15 of

the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain ES&S from continuing to

violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  Each of the Plaintiff States brings this

action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the violation

by Defendant of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Plaintiff States, by and

through their respective Attorneys General, or other authorized officials, bring this action in their

sovereign capacities and as parens patriae on behalf of the citizens, general welfare, and economy

of each of their states.

6.      Defendant ES&S develops, sells and services voting equipment systems in the

flow of interstate commerce.  ES&S's activities in developing, selling and servicing voting

equipment systems substantially affect interstate commerce.  The Court has jurisdiction over this

action and over the parties pursuant to 15 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

7.      ES&S transacts business, and has consented to venue and personal jurisdiction, in

the District of Columbia.  Venue is therefore proper in this District under Section 12 of the

Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## IV. **BACKGROUND**

8.      In the wake of the 2000 Presidential Election, Congress enacted the Help America

Vote Act (HAVA) to address perceived shortfalls in the accuracy, security and reliability of

voting equipment. 42 U.S.C. §§ 15301-15545 (2002).  HAVA authorized funding of

approximately $3.86 billion to encourage jurisdictions responsible for the administration of

elections to replace mechanical voting devices such as lever and punch card machines with new

electronic voting equipment systems.  HAVA also created a new agency, the Election Assistance

Commission (EAC), to adopt standards for and certify voting equipment systems to ensure their

reliability and security.  The EAC issued standards in 2002 and 2005, and those standards

continue to evolve.  HAVA also required that voting equipment systems contain devices that

allow disabled voters to cast and verify their votes privately and independently.  42 U.S.C.

§ 15481(a)(3)(A)-(B) (2002).

9.      State law sets the certification requirements for any voting equipment system

installed within a state.  Most states require that voting equipment systems or the devices that

comprise those systems be certified, either at the federal level by the EAC, or at the state level

according to standards set by the election authorities of that state.  State certification regimes may

be more or less rigorous than that of the EAC, and some states require that a vendor be certified

by both the EAC and the state's own process.  A minority of states require neither federal nor

state certification, but describe technical standards for vendors responding to requests for

proposal ("RFP") for voting equipment systems.

10.      Voting equipment systems are purchased either by a state agency or by an election

board or official at the county or local level.  A jurisdiction typically goes through an extensive

public procurement process to identify the correct system to meet its needs and determine its preferred vendor. Before bids are seriously considered, vendors often must be qualified by meeting certain financial criteria. The procurement process for large, complex customers can span more than a year, involves extensive communications between the customer and vendors, typically requires public demonstrations of equipment, and often involves third-party consultants hired by the customer. As vendors proceed through the procurement process, they usually become more familiar with the needs of the customer and the competing vendors under consideration. Often, customers allow a discrete group of vendors to proceed to a best and final round, where vendors may revise the terms of their bids, including price terms, before a winning bid is selected.

11.    Performance of voting equipment systems on Election Day is critical because the failure of a system, or any of the devices within a system, can affect the integrity of the democratic process, a failure that often cannot be remedied. Although certification testing of voting equipment systems and devices is designed to identify technical deficiencies, many certified devices have demonstrated security and accuracy problems when deployed in the field for an election. However, customers typically use voting equipment systems only once or twice every two years, so opportunities to test the reliability of equipment are few. As a result, an established record of successful voting equipment performance is of great importance to customers in evaluating the likely accuracy and reliability of a voting equipment system. Election administrators, who often are elected officials themselves, use successful past experience as one basis for judging the reliability of a voting equipment system.

12.     The significant variation of election laws and practices among jurisdictions results in substantial differences in customers' technical requirements for their voting equipment systems. A jurisdiction's voting equipment system needs also may be based on the number of registered voters; the density of population within geographic boundaries; the number of polling sites; accommodation of the needs of disabled voters; ballot complexity, including legal requirements for ballot design, and the number of different ballot layouts, languages, and political parties; frequency of elections; requirements for processing absentee ballots; timing of reporting results; and other issues.

13.     Between 2002 and 2006, most states procured new voting equipment systems, exhausting their HAVA funds. Most of these jurisdictions anticipate that their new systems will last at least ten years. Given the current economic environment, many jurisdictions are considering attempts to extend the life of existing systems by investing in repair, service, and upgrades, in order to forestall the need to purchase new systems. However, a few states and several large counties anticipate purchasing a new voting equipment system in the next year or two. A number of other jurisdictions have relatively old voting equipment systems that may need to be replaced within the next several years.

14.     Since 2005, several jurisdictions have required that voting equipment systems create a paper-based record of each vote cast, out of concern that the electronic audit component of some devices within the system was insufficiently secure to guarantee the accuracy of election results. Vendors believe this movement has created and will continue to create additional demand for new voting equipment systems over the next few years, despite the exhaustion of HAVA funding.

## V.  **TRADE AND COMMERCE**

A.     **The Relevant Product Market**

15.     A voting equipment system is the integrated collection of customized hardware, software, firmware and associated services used to electronically record, tabulate, transmit and report votes in an election.  The number, variety, and operation of electronic components vary depending on the needs of the jurisdiction responsible for administering elections, which may be the state, county or local government, depending on state law.

16.     A voting equipment system differs from the mechanical lever and punch card voting devices used in the past in conjunction with manual tabulation methods.  Mechanical systems cannot accommodate speedy tabulation across a large number of voters; do not allow disabled voters the opportunity to cast an independent, private ballot; and are considered less accurate and reliable than voting equipment systems.

17.     Hardware devices used to electronically record votes vary by recording method, and can be used for a variety of functions.  These devices may include precinct or central count Optical Scan ("OS") devices; Direct Recording Electronic ("DRE") devices; and Ballot Marking Devices ("BMD").  In addition to the basic function of recording a vote cast on Election Day, these devices may be used to create a paper record of each vote, to allow independent voting by disabled voters, and to read votes cast by absentee or vote-by-mail voters.  Depending on the needs of the jurisdiction, a voting equipment system may include only one type of device, or several different types of devices used in concert.  All three types of recording devices feed votes into a tabulator, which counts each vote and prepares a report, with the assistance of associated software and firmware.

-8-

18.    OS devices create a paper record of each vote and are commonly used to read

absentee ballots, but cannot provide a completely private and independent voting experience for

any disabled voter.  OS devices require a voter to mark an individual paper ballot, which is then

inserted into a scanner to be electronically read.  Central Count OS devices, particularly high-

speed, digital models, are commonly used to read ballots submitted by absentee or vote-by-mail

voters.  Most OS devices read and record voter marks as data, though some digital devices

capture the actual image of the ballot, to better judge the intent of the voter.  Typically, OS

devices cannot fully enable a disabled voter to cast a ballot independently, as assistance in

marking the ballot and transferring it to the ballot box is required.

19.    DRE devices, sometimes referred to as touch screens, allow a voter to enter a vote

by interfacing directly with a monitor screen, and some models are equipped with a device that

creates a scrolling paper record of the votes recorded, often referred to as a Voter Verified Paper

Trail.  DRE devices allow disabled voters to cast their vote independently, so they often are

provided exclusively for the use of disabled voters at polling places that may otherwise rely on

OS equipment.  DRE devices cannot be used to read ballots submitted by mail.

20.    BMD's require a voter to insert an individual paper ballot into an electronic

device, and then mark that ballot using a small monitor interface and specialized electronic pen.

BMDs are designed to accommodate disabled voters, allowing the independent recording of a

vote, but pollworker assistance still is required to transfer the marked ballot to the ballot box.

BMDs cannot be used to read ballots submitted by mail.

21.    The recording and tabulation devices contained within a voting equipment system

are bound together by a collection of proprietary election management software and firmware.

The software and firmware enables the operation of each device, communication between devices and reporting of the election results.

22.     Jurisdictions purchase voting equipment systems bundled with a variety of services for the initial implementation and long-term service and support of the system.  Initial implementation services often include project management, equipment delivery, administrator and pollworker training, and warrantees on devices.  Post-implementation services include hardware, software and firmware maintenance agreements, and also may include annual services such as ballot layout, ballot printing, Election Day help-desk support and other Election Day services.  Typically, any service that may require changes to hardware, software or firmware must be performed by the original vendor, or that vendor's licensed representative.

23.     Jurisdictions evaluate competing bids to provide voting equipment systems based on compliance with state law, technical standards, certification standards, experience in other jurisdictions and commercial standards such as price, delivery schedule and other terms of sale. The combined technical and commercial needs of the customer differ for each voting equipment system bid.

24.     A small but significant increase in the price that vendors bid to provide voting equipment systems to customers would not cause customers to substitute away from electronic voting equipment systems so as to make such a price increase unprofitable.  Accordingly, voting equipment systems are a line of commerce and relevant product market within the meaning of Section 7 of the Clayton Act.

**B.     Geographic Market**

25.     In the United States, customers of voting equipment systems prefer suppliers with a substantial physical presence in the United States, including a network of sales, technical and support personnel and parts distribution.

26.     Customers prefer such vendors because, during the design, bid, and implementation phases of installing a new voting equipment system, customers interact with vendors to test system functionality, adjust technical specifications, correct design flaws, track progress and ensure successful implementation.  Further, customers require that vendors have a significant local service presence to assist annually in the preparation for Election Day, and to immediately address system problems arising on Election Day.

27.     A small but significant increase in the price of voting equipment systems would not cause a sufficient number of U.S. customers to turn to suppliers of voting equipment systems that do not have a substantial physical presence in the United States so as to make such a price increase unprofitable.  Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

**C.     Anticompetitive Effects of the Acquisition**

28.     ES&S's acquisition of Premier united two firms that many customers considered the two closest competitors in the provision of voting equipment systems, with the likely effects of higher prices, a decline in quality and innovation and changes in other key elements that are considered detrimental by most U.S. customers in the evaluation of bids to provide voting equipment systems.  ES&S and Premier were considered the closest competitors by many customers because the two companies offer systems certified in the greatest number of

-11-

jurisdictions; offer a complete suite of voting equipment system products; and have a reputation for reliable equipment. Having acquired its closest competitor, ES&S will have a reduced incentive to compete as aggressively for bids or to invest in new products, unilaterally reducing the quality and increasing the price of voting equipment systems available to most jurisdictions.

29.    Some customers identified ES&S and Premier as the only vendors qualified to meet the jurisdiction's certification requirements. For instance, ES&S and Premier are the only two vendors that offer EAC-certified voting equipment systems that include an OS device and a BMD. Indeed, at the time of the acquisition, ES&S and Premier were the only active vendors that had achieved EAC-certification at all. Likewise, ES&S and Premier voting equipment systems are certified or approved in 42 and 33 states, respectively; more states, by far, than any other vendor.

30.    Prior to the acquisition, ES&S and Premier had the unique ability to offer a complete suite of voting equipment choices. An array of devices often is important to meet the goals of providing a paper-based system, accommodating disabled voters, and processing absentee ballots expeditiously. Because voting equipment systems use proprietary software, customers do not have the option of selecting the best in breed of each type of device from many vendors and integrating those pieces into a coherent system. A vendor that can offer a full complement of equipment choices within a given system often provides a benefit to the customer.

31.    In order to better secure voting equipment systems that have been tested by past experience in similar jurisdictions, many customers view the past experience of a vendor's equipment as a key element in evaluating its bid. Moreover, the more that past experience

replicates conditions anticipated in the customer's jurisdiction, the more it augurs for success. ES&S and Premier are two of only three vendors whose voting equipment systems have been deployed in multiple statewide implementations. Likewise, the two companies have the broadest range of past experiences to call upon, making them most likely to be the bidders with the most experience and the most relevant experience for any particular bid.

32.      Only three other firms compete to provide voting equipment systems. None of these competitors is likely to replace the constraint Premier once exercised on ES&S's bidding behavior. Each of these firms is limited by the level of certification obtained, lack of a full product line, and the lack of proven equipment. At least one of these firms is also limited by the lack of financial ability to expand. None of these vendors shares the attributes that made Premier a close competitor to ES&S, and none is likely to substantially constrain ES&S's behavior in future bids.

33.      In contrast, numerous jurisdictions have benefitted from vigorous price competition between ES&S and Premier in the past. ES&S and Premier were the first and second lowest bidders for recent bids let by states for statewide voting equipment systems. In at least three recent bids for county-wide voting equipment systems, each worth between $1 million and $6 million, ES&S and Premier were the closest bidders.

34.      ES&S and Premier have been more successful than any other vendor in competing to meet the disparate requirements of U.S. customers, as evidenced by each company's portion of the installed base of voting equipment systems. Prior to the acquisition, ES&S was the incumbent provider to 47 percent of all registered voters in the United States, and Premier was the incumbent to 23 percent of all registered voters. As a result of its acquisition of Premier,

-13-

ES&S became the incumbent for more than 70 percent of all registered voters in the United States.

35.      One recent state-wide procurement illustrates the closeness of competition between ES&S and Premier, and how that competition restrained ES&S's bidding behavior. The state issued a long-anticipated set of RFPs for procurement of a new statewide voting equipment system that called for the provision of a system that included OS devices that had been tested by an EAC-certified laboratory. As part of the scoring methodology, the RFPs also required that bidders identify past installations of voting equipment systems, and describe the scope and complexity of the installed jurisdiction. ES&S anticipated Premier would be the front runner for this opportunity. In early 2009, ES&S projected that Premier would low-ball the bid, and gave serious consideration to changing its bid price in response. Six days before bids were due, ES&S acquired Premier. Bids were submitted on behalf of both Premier and ES&S, but the state could not consider the Premier bid as a result of ES&S's acquisition of and changes to Premier. No other vendor responded to this RFP, and ES&S was approved by the state board overseeing the procurement in December 2009.

36.      The acquisition of Premier both ended its competitive influence on specific bids, and reduced ES&S's incentive to develop new products and upgrade existing products. In response to continuing concerns about the security and reliability of voting equipment systems, technical standards for voting equipment systems are constantly evolving. ES&S considered Premier the firm most responsive to these evolving certification standards, and elected to follow Premier's lead in the development of new products. For example, in the Fall of 2009, ES&S introduced its own digital scan high-speed OS central count device in response to a similar

device introduced by Premier a year earlier.  ES&S is unlikely to continue such innovation absent competition from Premier.  Prior to its acquisition, Premier submitted an improved voting equipment system to certification authorities for testing in two states, but ES&S withdrew those applications following the acquisition.  In the absence of competitive pressure from Premier, ES&S is unlikely to have the same incentive to develop new products in the future.

37.     ES&S's acquisition of Premier, therefore, likely will substantially lessen competition in the United States market for voting equipment systems, which likely will lead to higher prices, lower quality and less innovation in violation of Section 7 of the Clayton Act.

**D.      Difficulty of Entry into the Provision of Voting Equipment Systems**

38.     Successful entry into the provision of voting equipment systems is challenging, time-consuming, and costly.  Entry requires not only the design and development of hardware, software and firmware products, but also obtaining multiple levels of certification, establishing a reputation for reliable performance, and financial wherewithal sufficient to assure a buyer of long-term service capabilities.

39.     EAC certification may cost more than $1 million for each system certified, and may take fifteen to twenty-four months.  These costs are in addition to internal development costs, estimated at $2.5 to $5 million.  Previous certification attempts by established companies such as Premier have consumed more than $3 million and required three years.  For at least three of the largest state jurisdictions, certification requires an additional investment of time and money.  ES&S, for instance, spent approximately $4 million to become certified in one state.  Other states may be even more rigorous, requiring that voting systems be certified both by the EAC and by the state.

40.     Certification alone is not sufficient for a company that does not have equipment

with a proven record of reliable performance.  One company recently obtained 2005 EAC-

certification for its new OS device, after two years of product development and testing, and an

investment of millions of dollars.  Despite the time and money invested, the company has yet to

sell a single certified device.

41.     Given the time and expense required for certification, the long lifecycle of voting

equipment systems, the time required to demonstrate reliable performance of equipment, and the

absence of ready capital to fund new investment in the voting equipment system industry, entry

into the provision of voting equipment systems would not be timely, likely and sufficient to

prevent an exercise of market power by ES&S.

## VI.  VIOLATION ALLEGED

42.     ES&S's acquisition of Premier substantially lessened competition in the U.S.

market for voting equipment systems in interstate trade and commerce in violation of Section 7

of the Clayton Act, 15 U.S.C. § 18.

43.     This acquisition has had the following anticompetitive effects, among others:

    a.     competition between ES&S and Premier in the provision of voting
equipment systems in the United States has been eliminated;

    b.     competition generally in the provision of voting equipment systems in the
United States has been substantially lessened; and

    c.     prices will likely increase, quality will likely decrease, and innovation will
be less likely.

## VII. **REQUESTED RELIEF**

44.    Plaintiffs request that this Court:

a.    Adjudge and decree that the Defendant ES&S's acquisition of Premier violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.    Compel ES&S to divest Premier assets related to the development, manufacture and sale of the relevant products to enable independent and effective competition;

c.    Award such temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of the dissipation of Premier's tangible and intangible assets during the pendency of this action and to preserve the possibility of effective final relief;

d.    Award the Plaintiffs the cost of this action; and

e.    Grant the Plaintiffs such other and further relief as the case requires and the Court deems just and proper.

Dated: March 8, 2010

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**

Molly S. Boast
Acting Assistant Attorney General

Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar # 435204

Patricia A. Brink
Deputy Director of Operations

Dorothy B. Fountain
Assistant Chief, Litigation II Section
D.C. Bar # 439469

Stephanie A. Fleming
James K. Foster
Erin Carter Grace
Blake Rushforth
Attorneys
U.S. Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, NW
Suite 8700
Washington, D.C. 20530
Tel: (202) 514-9228
Fax: (202) 514-9033
Email: Stephanie.Fleming@usdoj.gov

**FOR PLAINTIFF STATE OF ARIZONA**
TERRY GODDARD
Attorney General
State of Arizona

NANCY M. BONNELL
AZ Bar # 016382
Antitrust Unit Chief
Consumer Protection & Advocacy Section
1275 West Washington
Phoenix, AZ 85007
Tel: (602) 542-7728
Fax: (602) 542-9088
Email: Nancy.Bonnell@azag.gov

**FOR PLAINTIFF STATE OF COLORADO**
JOHN W. SUTHERS
Attorney General
State of Colorado

_____
Devin Laiho
Assistant Attorney General
Antitrust Enforcement
Office of the Attorney General
1525 Sherman St., Seventh Floor
Denver, Colorado 80203
Tel: (303) 866-5079
devin.laiho@state.co.us

**FOR PLAINTIFF STATE OF FLORIDA**
BILL McCOLLUM
Attorney General
State of Florida

*Russell S. Kent*

PATRICIA A. CONNERS
Associate Deputy Attorney General
Chief, Antitrust Division
RUSSELL S. KENT
Special Counsel for Litigation
LIZABETH BRADY
Chief, Multistate Antitrust Enforcement
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Fax: (850) 488-9134
Email: trish.conners@myfloridalegal.com
Email: russell.kent@myfloridalegal.com
Email: liz.brady@myfloridalegal.com

**FOR PLAINTIFF STATE OF MAINE**
JANET T MILLS
Attorney General
State of Maine

*Christina M. Moylan*

CHRISTINA M. MOYLAN
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Tel: (207) 626-8838
Fax: (207) 624-7730
Email: christina.moylan@maine.gov

**FOR PLAINTIFF STATE OF MARYLAND**

DOUGLAS F. GANSLER
Attorney General
State of Maryland


ELLEN S. COOPER
Assistant Attorney General
Chief, Antitrust Division


JOHN R. TENNIS
Assistant Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Tel: (410) 576-6470
Fax: (410) 576-7830
E-mail: jtennis@oag.state.md.us

**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS**
MARTHA COAKLEY
ATTORNEY GENERAL

WILLIAM T. MATLACK, BBO #552109
Chief, Antitrust Division
Matthew M. Lyons, BBO #657685
Assistant Attorneys General
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 727-5765
Email:William.Matlack@state.ma.us
Email: Matthew.Lyons@state.ma.us

**FOR PLAINTIFF STATE OF NEW MEXICO**
GARY KING
Attorney General
State of New Mexico

DEYONNA YOUNG
NM Bar # 2980
Assistant Attorney General
Office of the Attorney General of New Mexico
111 Lomas Blvd. NW, Suite 300
Albuquerque, NM 87102
Tel: (505) 222-9089
Fax: (505) 222-9086
Email: dyoung@nmag.gov

**FOR PLAINTIFF STATE OF TENNESSEE**
ROBERT E. COOPER, JR.
Attorney General and Reporter
State of Tennessee


_____
Victor J. Domen, Jr. (BPR# 015803)
Senior Counsel
State of Tennessee
Office of the Tennessee Attorney General
Consumer Advocate and Protection Division
425 Fifth Avenue North
Nashville, TN 37243
Tel: (615) 532-5732
Fax: (615) 532-2910
Email: Vic.Domen@ag.tn.gov

**FOR PLAINTIFF STATE OF WASHINGTON**
ROB McKENNA
Attorney General
State of Washington

DAVID KERWIN
Assistant Attorney General
Washington State Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: (206) 464-7030
Fax: (206) 464-6338
Email: davidk3@atg.wa.gov

TINA KONDO
Deputy Attorney General
Washington State Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: (206) 464-6293
Fax: (206) 587-5636
Email: tinak@atg.wa.gov

## CERTIFICATE OF SERVICE

I, Stephanie Fleming, hereby certify that on March 8, 2010, I caused a copy of the

Complaint to be served on defendant Election Systems and Software, Inc., by mailing the

document via email to the duly authorized legal representative of the defendant, as follows:

FOR ELECTION SYSTEMS & SOFTWARE, INC.
Joseph G. Krauss
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jgkrauss@hhlaw.com

Stephanie A. Fleming, Esq.
United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530
(202) 514-9228
(202) 514-9033
stephanie.fleming@usdoj.gov